**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

DATA MONITOR SYSTEMS, INC.,

     Plaintiff,

v.                                        20-cv-00810-MV/KK

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS LOCAL 492,

     Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment [Doc. 14] and Plaintiff's Motion for Summary Judgment and Brief in Support [Doc. 15]. The Court, having considered the Motions, briefs, and relevant law, and being otherwise fully informed, finds that Defendant's Motion is well-taken and will be granted and Plaintiff's Motion is not well-taken and will be denied.

**BACKGROUND**

The undisputed facts are as follows. From November 2012 through April 2018, Plaintiff Data Monitor Systems ("DMS") was a subcontractor of prime contractor Chiulista Services, Inc. ("Chiulista") on a government staffing contract at Kirtland Air Force Base ("Kirtland") in New Mexico. Doc. 15 ¶¶ 1-2. Both Chiulista and DMS had employees working at Kirtland under a single collective bargaining agreement ("CBA") with Defendant International Brotherhood of Teamsters Local 492 ("the Union").  Doc. 15-9.

The CBA states in relevant part that, except as otherwise provided therein, DMS (as management), retains the right to "discipline, demote, suspend, discharge and terminate employees, for just cause." *Id.* at 4. In a section entitled "Cause for Discharge or Suspension," the

CBA further provides that DMS (as the employer) "shall not discharge or suspend any employee without just cause, but in respect to discharge or suspension shall give at least one (1) written notice of the complaint against said employee, with a copy to the Union," with exceptions not relevant here. *Id.* at 7. As DMS's "work site is located on a U.S. Air Force Military Installation," the CBA notes that "it is understood that the employees are subject to the terms and conditions imposed by Air Force regulations and those of the Base Commander." *Id.* The CBA further indicates that "[e]mployees may be discharged for loss of a Military Security Clearance or loss of privileges to use Government provided equipment required in the performance of their work related duties," and that "[a]ny employee barred from access to the base by the Base Commander or the Base Security Police will be discharged." *Id.* The CBA sets forth a grievance procedure whereby, if a dispute cannot be settled by the parties, the Union has "the right to submit the matter for final decision to an arbitrator." *Id.* at 8. The CBA makes clear that the arbitrator "shall not have the power to add to, subtract from, or modify any of the terms" of the CBA," and that the arbitrator's decision "shall be final and binding upon both parties." *Id.* at 9.

From June 21, 2013 through October 3, 2016, Debra Cox was an employee of DMS, working as a stock clerk at Kirtland with access to secured areas and the weapons vault. Doc. 15 ¶¶ 3, 7. During her employment at DMS, Ms. Cox was a member of the Union and subject to the CBA. *Id.* ¶ 3. As an employee of DMS, Ms. Cox was also subject to the policies set forth in the DMS Employee Handbook. *Id.* ¶ 12. And as an employee assigned to Kirtland, Ms. Cox was also subject to Air Force policies. *Id.* ¶ 13.

On the evening of Thursday, September 29, 2016, Ms. Cox was present at a meeting at Kirtland involving several Union employees, Union stewards, and Jerry Potts, the general manager

at Kirtland for Chiulista Services. *Id.* ¶ 4. DMS management was neither present at, nor invited to, the meeting. *Id.* At some point during the meeting, Ms. Cox became agitated and angry about issues arising from her thwarted efforts to become an employee of Chiulista (she had applied for, but not been offered, a job there several months earlier). ¶¶ 5, 6. Ms. Cox stated to Kevin Pohl, a Union steward, "I'm coming after you." *Id.* 6. Ms. Cox then stated to Mr. Potts, "and I'm coming after you too, Mr. Potts." *Id.* Mr. Potts asked Ms. Cox if that was a threat. *Id.* Ms. Cox did not respond to his question, and instead exited the building. *Id.*

Mr. Potts informed DMS management of the incident over the telephone late that evening and in writing early the next morning, stating that he considered Ms. Cox's statement to be "a very real threat," and that, in his opinion, Ms. Cox needed "to be removed from the contract immediately." *Id.* ¶ 8; Doc. 15-1 at 8. DMS immediately relieved Ms. Cox of her duties with pay and informed her not to come to work pending further investigation of the matter. Doc. 15 ¶ 8.

On October 3, 2016, Mr. Potts sent an email to Christine Schneider, the Kirtland Supply Contracting Office Representative, advising her that an employee had "threatened" him and Kevin Pohl, and noting that he "expect[ed] termination" of Ms. Cox for violating both Kirtland and DMS anti-violence policies. Doc. 15-5. In response, Ms. Schneider indicated that, because of Ms. Cox's access level, they were requesting "an immediate inventory of the weapons vault, weapons safe and classified vault" and an "immediate combination change to the weapons safe and all cypher locks." *Id.* She further stated that, because this was a "'threat' situation," Ms. Cox's common access card ("CAC") "should be confiscated" to ensure that she did not have "access to the base until situation/investigation resolved." *Id.*

DMS investigated the incident, obtaining written statements from Mr. Potts, speaking to the Union steward over the telephone, and obtaining a written statement from the one Union steward who was willing to provide a statement. Doc. 15 ¶ 10. DMS management also met with Ms. Cox, who confirmed, both orally and in writing, what she had said to Mr. Pohl and Mr. Potts. *Id.* ¶ 11.

As a result of the information DMS had gathered, DMS terminated Ms. Cox on October 4, 2016, for a verbal threat in violation of DMS and Air Force workplace violence policies. *Id.* ¶ 14. DMS presented Ms. Cox with a "Separation Notice," dated October 3, 2016, which was signed by both Ms. Cox and a DMS project manager on October 4, 2016. Doc. 15-4. The Separation Notice indicates that the reason for separation is "discharge" for "conduct" and "verbal threat." *Id.* A "Disciplinary Action Form" attached to the Separation Notice indicates that Ms. Cox was subject to termination for having engaged in a "work rule violation," referring to "Employee Handbook Pgs.," and a box next to "Fighting/Acts of Violence Creating Conflict" is also checked. *Id.* In describing the incident during which Ms. Cox said that she was "coming after" Mr. Pohl and Mr. Potts, the Form states that these "verbal threats" "are taken seriously and are against the policies outlined in the Data Monitor Systems Inc. Employee Handbook 2015." *Id.* The Form goes on to cite to the DMS policy for Conduct Standards and Discipline, which states that an employee "may [] be disciplined or immediately terminated for misconduct, including, but not limited to . . . [c]onfirmed verbal or physical threat," and to the DMS Workforce Violence Policy, which states that "DMS has a zero-policy concerning threats, intimidation and violence of any kind in the workplace either committed by or directed by our employees." *Id.* The Form then cites to an Air Force policy (AFI 36-703 5.5), which states that "violence, threats, harassment, intimidations and

other disruptive behavior will not be tolerated in the workplace," that "all reports of incidents will be taken seriously and will be dealt with appropriately," and that individuals "who engage in such behavior" may be "immediately removed from the premises," "denied re-entry pending completion of an appropriate investigation," and "subject to removal from federal service, criminal prosecution, or both." *Id.*

Finally, the Form indicates that Ms. Cox disagreed with the incident description contained therein. *Id.* An attachment to the Form contains a handwritten statement by Ms. Cox in which she states that "coming after [Mr. Potts]" meant that she "was going to file a grievance under Art. 7 Fill Job Vacancy and going to [E]EOC [to file] a complaint." *Id.*

After her termination, Ms. Cox commenced a grievance procedure by filing a Complaint Record, in which she protested her October 4, 2016 termination on the basis that "there was no physical assault." Doc. 15-8. After reviewing her Complaint, on October 6, 2016, Mr. Potts sent a letter to Mr. Pohl, stating that Chiulista and DMS "strongly stand behind the decision to terminate Ms. Cox." Doc. 15-1 at 21.

On October 19, 2016, Mr. Pohl sent an email message to Harvey Watson, Vice President of Operations for DMS, reporting the Union's intention to proceed to arbitration. *Id.* Upon review of Mr. Pohl's email message, later that same day Mr. Potts sent an email to the Air Force (Brian Clark), in which he "reminded him that the government owns, approves and issues the Common Access Card," and that "the Union could win an arbitration forcing the company to bring [Ms. Cox] back during the duration of the contract." *Id.* He asked for help "to further support our effort to maintain the termination of this employee." *Id.* Again on October 21, 2016, Mr. Potts sent another email to Mr. Clark, stating that, after speaking to their attorney, DMS "felt as though it

5

would be a futile effort" to arbitrate Ms. Cox's termination "as the Union stands a very good chance of winning which would then cause the company to make [Ms. Cox] 'whole' and bring [her] back on to staff." *Id.* He asked Mr. Clark "to get back to [him] as quickly as possible with any information that [he might] use to either support our effort in the termination, or, if there is nothing that can be done, at the very least avoid the arbitration and bring [Ms. Cox] back." *Id.*

In response, on October 26, 2016, Elizabeth Sanchez, Air Force Contracting Officer, sent a memorandum indicating that, due to the "extreme actions" of Ms. Cox, the government did not "feel confident or comfortable" with her, and, as a result, the Logistics Readiness Squadron's Commander was "revoking all access to all controlled areas, computers, networks, weapons vaults, and all classified information." *Id.* at 21-22. Further, the memorandum stated that Ms. Cox would "not be granted a Common Access Card, and [would] not be appointed as an official representative on any memorandums." *Id.* at 22. Finally, the memorandum directed that Ms. Cox "be removed from the identified contract." *Id.*

On November 1, 2016, Mr. Pohl sent a letter to Mr. Watson, advising that Ms. Cox was "in the process of filing an appeal" of the government's memorandum, and that the Union would "hold her grievance in abeyance pending the outcome of the appeal." *Id.* at 23. Although Ms. Cox retained an attorney to assist her with her appeal, her attempt was unsuccessful. *Id.*

Nonetheless, on May 9, 2018, Ms. Cox was offered a position at Quanterion Solutions, another contractor at Kirtland. *Id.* Ms. Cox accepted the position, and worked for Quanterion, at Kirtland, from May 24, 2018 through April 16, 2019.  *Id.* During that period, she had a CAC card at Kirtland. *Id.*

Although Ms. Cox and Chiulista reached a settlement, *see id.* at 24, the Union renewed its pursuit of the grievance against DMS, and demanded arbitration at some point in 2018. Doc. 15 ¶ 24. On October 4, 2019, DMS and the Union arbitrated the matter before Labor Arbitrator Louise Wolitz. *Id.* ¶ 26. The issue presented by the parties to the Arbitrator was: "Was the discharge of Debra Cox issued for just cause, and if not, what should be the remedy?" Doc. 15-1 at 24.

During the arbitration proceeding, Mr. Watson testified that "Ms. Cox was terminated for making a verbal threat, not for losing her common access card. . . . [T]he only reason was for the verbal threat." Doc. 15-1 at 14. As to the grievance filed by Ms. Cox following her termination, Mr. Watson testified that initially DMS felt that "if they could work it out with the government, they could reinstate her," but that because "[t]he government would not re-issue the CAC and/or give her authorization to work on the contract, [] the issue was moot. It was impossible to reinstate her." *Id.* at 13-14.

On May 19, 2020, the Arbitrator issued her decision (the "Decision"). In her Decision, the Arbitrator stated that "[t]he Company's burden of proof must be based on what information it had on October 4, 2016. To bear this burden, the Company must demonstrate that it had just cause to terminate Debra Cox on October 4, 2016." *Id.* at 24. The Arbitrator found that the investigation performed by DMS prior to terminating Ms. Cox "clearly did not meet the standards of just cause." *Id.* at 25. Rather than "seriously consider[] whether or not Ms. Cox was actually making a threat of physical violence," "[t]he investigation merely sought to confirm that she had made the statements Mr. Potts said that she had made and considered a threat." *Id.* Finding that "the decision to discharge Debra Cox made on October 4, 2016 was not for just cause," the Arbitrator ordered that Ms. Cox "be made whole" by DMS "for all pay and benefits lost, with interest at the Federal

judgment rate, from the date of her termination on October 4, 2016 to the date she began employment at Quanterion on May 24, 2018." *Id.* at 28. In a subsequent decision issued on September 4, 2020 (the "Second Decision"), the Arbitrator ruled that, in remedy for her discharge, Ms. Cox "must be paid by [DMS] $96,922.62." Doc. 14-2.

DMS then commenced an action in this Court, seeking to vacate the Decision and award of the Arbitrator. Doc. 4. Agreeing that no material facts are in dispute, DMS and the Union filed cross-motions for summary judgment (Docs. 14 and 15), which are now before the Court.

## STANDARD

"Because the parties have contracted for an arbitrator to resolve their disputes, not a court," the Court's "standard of review of an arbitrator's award is among the narrowest known to the law." *LB & B Assocs., Inc. v. Int'l Bd. of Elec. Workers, Local No. 113*, 461 F. 3d 1195, 1197 (10th Cir. 2006) (citations omitted). Accordingly, "whether the arbitrator's reading of the agreement was strained or flawed . . . is irrelevant." *Id.* (citation omitted). "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of [her] authority, that a court is convinced [the arbitrator] committed serious error does not suffice to overturn [her] decision." *Id.* (citation omitted). "So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that [she] finds, courts have no authority to disagree with [her] honest judgment in that respect." *United Paperworkers Int'l Union, ALF-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *see also United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960) ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies.").

Although thus entitled to "profound deference," an arbitrator's discretion "is not unlimited." *LB & B Assocs.*, 461 F. 3d at 1197. Rather, "an arbitrator is confined to interpretation and application of the collective bargaining agreement; [s]he does not sit to dispense [her] own brand of industrial justice." *Local No. 7 United Food & Comm. Workers Int'l Union v. King Soopers, Inc.*, 222 F.3d 1223, 1227 (10th Cir. 2000) (citation omitted). Accordingly, the arbitrator's "award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Id.* Notably,

> an award does not draw its essence from the CBA if

>> it is contrary to the express language of the contract or is so unfounded in reason and fact, so unconnected with the working and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator or if viewed in the light of its language, its context, and any other indicia of the parties' intention, it is without factual support.

*Id.* (citation omitted).

## DISCUSSION

As noted above, the parties agree that no material facts remain in dispute. DMS argues that, based on the undisputed facts, the Arbitrator's Decision must be vacated for two reasons: first, because it "directly contradicted the explicit terms of the parties' collective bargaining agreement," and second, because it "was clearly contrary to the compelling public policy of safety, security, order, and the integrity of base command's directives at United States military bases." Doc. 15 at 2. For the reasons set forth herein, the Court finds neither of these arguments availing, and instead agrees with the Union that DMS must comply with the Decision and Second Decision of the Arbitrator. Doc. 14 at 12.

I.  The Arbitrator's Decision Does Not Contravene the Discharge Provisions of the CBA.

9

DMS argues that the Arbitrator improperly "ignored" certain CBA provisions in reaching her Decision. Doc. 15 at 13. Specifically, DMS contends that two provisions in the CBA are controlling here: (1) the provision indicating that "[e]mployees may be discharged for loss of a Military Security Clearance," and (2) the provision indicating that "[a]ny employee barred from access to the base by the Base Commander or the Base Security Police will be discharged." According to DMS, these provisions are controlling because on October 26, 2016 – 23 days *after* DMS decided to terminate her – Ms. Cox "lost all access to the base, was to be removed from the contract, and could not be *reinstated* by DMS." *Id.* (emphasis added). DMS contends that, "[f]rom that point forward, the more general 'just cause' provisions of the CBA were no longer in play, and that, as a result, "[t]he Arbitrator [] clearly contradicted the specific discharge provisions of the CBA when she reasoned that DMS's 'burden of proof must be based on what information it had on October 4, 2016,' and that DMS had to 'establish just cause to terminate Debra Cox on October 4, 2016.'" *Id.* at 14. Essentially, DMS's theory is that the Arbitrator's award did not draw its essence from the CBA because the Arbitrator considered whether DMS had just cause to terminate Ms. Cox on October 4, 2016, rather than concluding, as DMS does, that the CBA's express language mandated that "[t]he ultimate issue was what DMS had to do on October 26, 2016 and not what DMS had done before that time." *Id.* This theory not only defies logic but also is untenable under controlling law.

The record demonstrates that Ms. Cox was terminated on October 4, 2016, for the sole reason that she had made a verbal threat to Mr. Potts on September 29, 2016. The Separation Notice and attached Disciplinary Action Form – prepared by DMS – make clear that the basis for Ms. Cox's discharge was her "verbal threat," which violated the DMS policies prohibiting verbal

or physical threats and an Air Force policy similarly prohibiting threats and intimidations. Nowhere do Ms. Cox's termination documents mention the loss of her access to Kirtland. Indeed, Mr. Potts conveyed to Kirtland, *before* Kirtland instructed DMS to confiscate her access card pending the outcome of DMS's investigation, that he expected Ms. Cox to be terminated for threatening him in violation of DMS and Air Force anti-violence policies. Indeed, DMS's own witness, Mr. Watson, confirmed through his testimony that "Ms. Cox was terminated for making a verbal threat, not for losing her common access card. . . . [T]he only reason was for the verbal threat."

The record further demonstrates that, after her termination on October 4, 2016, the issue no longer was whether to terminate Ms. Cox, but rather became, as Mr. Potts expressed in his email messages to Kirtland, whether to "bring her back," or, as Mr. Watson testified during the arbitration proceeding, to "reinstate her." Apparently concerned that the decision to terminate Ms. Cox would be reversed in arbitration, leaving DMS no choice but to bring her "back on to staff," Mr. Potts enlisted help from Kirtland. And only at that point, and in response to his two email messages, did Kirtland notify DMS via email message on October 26, 2016 that the Commander would revoke Ms. Cox's access to Kirtland and decline to grant her an access card. DMS's witness, Mr. Watson, confirmed through his testimony that, after receiving this notification from Kirtland, "the issue was moot. It was impossible to *reinstate* her." Indeed, in its moving brief, DMS admits that Kirtland's "October 26, 2016 directives . . . explicitly preclude[ed] DMS from *reinstating* her to employment." Doc. 15 at 14 (emphasis added).

Unable to rewrite history, DMS instead drops a footnote making the bizarrely dismissive and unsupported assertion that "[w]hether DMS's adherence to the directives of base command is

11

couched as a decision not to reinstate, a decision to discharge, or a decision to reaffirm a previous termination, is a semantic matter which makes no difference in this case." *Id.* But DMS fails to explain how the distinctions among these different employment actions can be reduced to a question of "semantics," given that the sole question the parties presented to the Arbitrator was unequivocally whether there was just cause for Ms. Cox's *discharge* – not DMS's subsequent refusal to reinstate her or its decision to "reaffirm" her termination. Nor does DMS provide any authority for its position that the Arbitrator contravened the CBA by refusing to ignore the undisputed sequence of events and relate back to Ms. Cox's termination Kirtland's revocation of her access to the base, which did not occur until weeks after her termination.

Indeed, in *Misco*, the Supreme Court specifically held that it is not open to the court "to refuse to enforce [an arbitration] award because the arbitrator, in deciding whether there was just cause to discharge, refused to consider evidence unknown to the Company at the time [the employee] was fired." 484 U.S. at 39. In that case, the controlling CBA reserved to management the right to establish rules and regulations regulating the discipline or discharge of employees and the procedures for imposing discipline. *Id.* at 32. One of rules established by the company listed as a cause for discharge the bringing of intoxicants, narcotics, or controlled substances onto plant property or consuming any of them there, as well as reporting for work under the influence of such substances. *Id.* at 32. While investigating employee Isiah Cooper in connection with suspected marijuana possession, police observed him in the company's parking lot enter his car momentarily, then walk to another car, a white Cutlass, and enter it with two other men. *Id.* at 33. After the other men left the car and returned to work, police apprehended Cooper in the back seat of the white Cutlass with marijuana smoke in the air and a lighted marijuana cigarette in the front seat ashtray.

*Id.* The police also searched Cooper's car and found a plastic scales case and marijuana gleanings. *Id.*

Cooper was ultimately charged with possession of marijuana in his home and reported that to the company. *Id.* The company also learned about the marijuana cigarette in the white Cutlass. *Id.* The company investigated and discharged Cooper, "asserting that in the circumstances, his presence in the Cutlass violated the rule against having drugs on the plant premises." *Id.* Cooper filed a grievance and the matter proceeded to arbitration. Nine months after his termination and five days before the arbitration proceeding began, the company learned that the police had found marijuana in Cooper's car. *Id.* As was the case here, the issue presented to the arbitrator was whether the company had "just cause" to discharge the employee and, "if not, what if any should be the remedy." *Id.* at 33-34.

The arbitrator upheld the grievance and ordered the company to reinstate Cooper with backpay, finding that there was not just cause for the discharge. *Id.* at 34. Specifically, "the arbitrator found that the company failed to prove that the employee had possessed or used marijuana on company property," explaining that "finding Cooper in the backseat of a car and a burning cigarette in the front-seat ashtray was insufficient proof that Cooper was using or possessed marijuana on company property." *Id.* Notably, "[t]he arbitrator refused to accept into evidence the fact that marijuana had been found in Cooper's car on company premises because the company did not know of this fact when Cooper was discharged and therefore did not rely on it as a basis for the discharge." *Id.* In support of this decision, the arbitrator stated that "one of the rules in arbitration is that the company must have its proof in hand before it takes disciplinary action

against an employee. The company does not take the disciplinary action and then spend eight months digging up supporting evidence to justify its actions." *Id.* at 34 n.6.

The company filed suit in federal district court, seeking to vacate the arbitration award on several grounds, including that ordering reinstatement of Cooper, who had allegedly possessed marijuana on the plant premises, was contrary to public policy. The district court agreed, and the court of appeals affirmed, noting that the arbitrator's refusal to consider the marijuana found in Cooper's own car on the company lot reflected "a narrow focus on Cooper's procedural rights that led him to ignore what he knew was in fact true: that Cooper *did* bring marijuana onto his employer's premises." *Id.* at 35 (emphasis in original).

The Supreme Court reversed, and in doing so, specifically found that the court of appeals had erred in vacating the award because the arbitrator had refused to consider evidence of the marijuana in Cooper's car. *Id.* at 39. The Court explained: "Here the arbitrator ruled that in determining whether Cooper had violated [the company's rules], he should not consider evidence not relied on by the employer in ordering the discharge . . . This, in effect, was a construction of what the contract required when deciding discharge cases: an arbitrator was to look only at the evidence before the employer at the time of discharge." *Id.* The Court agreed with the arbitrator that "this approach was consistent with the practice followed by other arbitrators," as "[l]abor arbitrators have stated that the correctness of a discharge must stand or fall upon the reason given at the time of discharge, and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge." *Id.* at 40, 40 n.8. The Court further noted that such "procedural" questions, "which grow out of the dispute and bear on its final disposition[,] are to be left to the arbitrator." *Id.* at 40. The Court concluded that, even if it were to

assume that the arbitrator had erred in refusing to consider the disputed evidence, "his error was not in bad faith or so gross as to amount to affirmative misconduct." *Id.* at 40.

Under *Misco*, this Court is foreclosed from vacating the Arbitrator's award on the basis that the Arbitrator refused to consider evidence of Kirkland's revocation of Ms. Cox's access to the base. Just as the company in *Misco* did not know about the marijuana in Cooper's car when it discharged him, DMS did not know of Kirkland's revocation of Ms. Cox's access to the base when it decided to discharge Ms. Cox. It follows that, just as the company in *Misco* did not rely on the marijuana in Cooper's car in discharging him, DMS did not rely on Kirkland's revocation of Ms. Cox's access to the base in discharging her. As *Misco* makes clear, the Arbitrator's decision to look only at the evidence before DMS at the time of discharge, and to rest the determination of whether that discharge was correct on the reason given at the time of discharge – that Ms. Cox's verbal threat violated DMS and Air Force polices – "was a construction of what the contract required," which is a "procedural" question properly "left to the arbitrator." *Id.* at 40. Indeed, the Arbitrator's approach not only was properly within her purview to choose, but also was "consistent with the practice followed by other arbitrators who have stated that the correctness of a discharge must stand or fall upon the reason given at the time of discharge, and often "confine their considerations to the facts known to the employer at the time of the discharge." *Id.*; *see also Air Methods Corp. v. OPEIU*, 737 F.3d 660, 666 (10th Cir. 2013) (applying *Misco* to hold that the arbitrator had acted "well within the scope of his authority when he looked to the reasons given for Ms. Stackpole's discharge in his effort to interpret the contractional provisions concerning the discharge of pilots."). It thus would be contrary to Supreme Court precedent for this Court to conclude that the Arbitrator erred in refusing to consider Kirkland's revocation of Ms. Cox's

access to the base; indeed, assuming *arguendo* that she had erred, such error "was not in bad faith or so gross as to amount to affirmative conduct." *Id.*

Rather than "clearly contradict[] the specific discharge provisions of the CBA," as DMS contends, the Arbitrator properly exercised her authority to construe "what the CBA required" in deciding to look only at the evidence before DMS at the time of discharge, namely, her verbal threat to Mr. Potts. And based on that proper exercise of her authority, it logically followed that whether DMS had just cause to terminate Ms. Cox on October 4, 2016 based on the verbal threat, rather than whether DMS was unable to reinstate Ms. Cox on October 26, 2016 when Kirkland revoked her access to the base, was the proper question before the Arbitrator. Indeed, "it was the parties who focused the arbitrator's attention on the 'just cause' issue rather than" on the CBA provision addressing discharge where an employee has been barred from access to the base, "and thus any possible error was invited." *Air Methods Corp.*, 737 F.3d at 666.

Nor does *Mistletoe*, the case upon which DMS relies to support its argument, alter this conclusion. In *Mistletoe*, the controlling CBA stated that employees "may be discharged for just cause," and listed among just causes the "[f]ailure to settle bills and funds collected for the company within twenty-four (24) hours." 566 F.2d at 694. A company rule also required that a driver accept only cash or cashier's checks in payment of C.O.D. deliveries. *Id.* On January 16, 1975, employee Martin delivered a C.O.D. shipment and accepted a personal check. *Id.* On January 23, Martin returned the check, collected in cash instead, and settled with the company that evening. *Id.* The company then terminated Martin's employment for failing to settle within 24 hours and accepting a personal check for a C.O.D. shipment. *Id.* Martin filed a grievance, and the arbitrator upheld the grievance, finding that while Martin's acts justified "discipline," "just cause was not

shown by the company for discharge," and ordering that "the supreme penalty of termination [] be reduced to a suspension." *Id.* The district court vacated the arbitration award, holding that "the arbitrator exceeded his authority by reading the theory of progressive discipline into the [CBA] and by changing the penalty from discharge to suspension." *Id.* The Tenth Circuit affirmed, stating:

> In reducing the penalty from discharge to suspension, the arbitrator substituted his views of proper industrial relationships for the provisions of the contract. He expressly found that there was just cause for discipline. The contract says that the acts, which the arbitrator found are just cause for discipline, are just cause for discharge. The arbitrator may not rewrite the labor contract.

*Id.* at 695.

Accordingly, *Mistletoe* stands for the proposition that, once an arbitrator has found just cause for discipline, she may not "rewrite" the contract to provide for discipline lesser than that expressly provided for in the CBA. This is not what happened here. The Arbitrator did not find just cause for Ms. Cox's termination, and then defy the terms of the CBA by reducing the penalty for her infraction. To the contrary, the Arbitrator found that DMS *did not* establish just cause in the first instance for *any* disciplinary action. And it was for this reason that she declined to uphold DMS's termination of Ms. Cox.

Moreover, as discussed above, the crux of the issue here is whether the Arbitrator erred in refusing to consider *after-developed evidence* in deciding whether Ms. Cox's termination was proper. Nothing of the sort was at issue in *Mistletoe*, where, *at the time of his termination*, the company had evidence both that Martin had accepted a personal check and that Martin did not settle within 24 hours of receipt of payment. To be sure, if DMS had waited until Kirtland revoked Ms. Cox's access to the base to terminate her, and in doing so, invoked the provision in the CBA stating that an employee barred from access to the base will be discharged, then a determination

17

by the Arbitrator that DMS did not have just cause to terminate Ms. Cox likely would be unenforceable under *Mistletoe*.

But DMS did not wait until Kirtland revoked Ms. Cox's access to the base before terminating her. Nor did DMS rely on the fact of Kirtland's revocation of her access to the base in terminating her. Because the Arbitrator did not expressly find just cause for discipline, and then reverse, reduce, or otherwise alter the penalty imposed by DMS, the Arbitrator did not engage in the sort of rewriting of the CBA prohibited by *Mistletoe*. *Mistletoe* thus is inapposite and lends no credence to DMS's argument that the Arbitrator's award did not draw its essence from the CBA.

Equally unavailing is DMS's contention that the award of backpay from the date of termination through May 24, 2018, the date on which Ms. Cox indeed was granted access to the base, is "in complete contradiction to the plain language of the CBA." Doc. 15 at 14. DMS's argument is premised on the fact that, beginning on October 26, 2016, when Kirkland revoked her access to the base, DMS would not have been able to employ Ms. Cox. But as discussed above, DMS did not wait to terminate Ms. Cox *until* her access was revoked or *because* her access was revoked. Rather, it terminated her because of her verbal threat to Mr. Potts, which the Arbitrator found was not just cause for her termination. Once the Arbitrator made this finding, it was within her "discretion to fashion an appropriate remedy given the circumstances." *Chevron Mining v. United Mine Workers Local 1307*, 648 F.3d 1151, 1156 (10th Cir. 2011). DMS's position is not so much that the Arbitrator "did not premise [her] award on [her] construction of the contract," as it is "merely [a] disagree[ment] with the arbitrator's construction of it." *Enterprise Wheel*, 363 U.S. at 598. This Court, however, is not permitted to "review the merits of every construction of

the contract," as such "plenary review . . . would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final." *Id.*

For these reasons, DMS has failed to substantiate its contention that the Abritrator "dispens[ed] her own brand of industrial justice," Doc. 15 at 16, in (1) deciding the specific issue of just cause presented to her by the parties by looking at the evidence before DMS when it terminated Ms. Cox, (2) deciding, based on that evidence, that DMS did not have just cause for the termination, and (3) awarding, based on that decision, back pay to Ms. Cox from the date of her termination through the date of her reemployment at Kirkland.

II.   The Arbitrator's Decision Does Not Contravene Public Policy.

DMS's public policy argument is premised on the faulty theory that the Arbitrator's Decision represents an improper "second guess[ing]" of "the decision of DMS to abide by" the "directives" of "the United States Department of Defense," which "clearly ordered that Ms. Cox not be allowed to work as an employee for DMS on base anymore." Doc. 15 at 19. According to DMS, by "impos[ing] a substantial backpay obligation on DMS even though the Arbitrator clearly found that base command had barred Ms. Cox from base access, and that DMS was prevented from reinstating her," the Arbitrator's Decision puts "federal contractors such as DMS on the horns of a dilemma." *Id.* at 19-20. Specifically, DMS asserts that, the Arbitrator's Decision forces federal contractors to choose between "follow[ing] the directives of the federal government they serve," thereby risking "major backpay awards," on the one hand, and declining "to report legitimate incidents to federal officers in order to avoid these potential consequences," on the other. *Id.* at 20. For this reason, DMS concludes, the Arbitrator's award "clearly violates public policy." *Id.*

As discussed above, the Court declines to adopt the theory on which DMS's public policy argument relies. The Arbitrator did not second guess the decision of DMS to decline to rehire Ms. Cox in compliance with Kirtland's "directives," issued on October 26, 2016, as the merits of that decision were not before her. Instead, the Arbitrator decided the wholly separate issue, presented to her by both parties, of whether DMS's decision to terminate Ms. Cox in the first instance on October 4, 2016 was supported by just cause. The governmental directives cited by DMS were not implicated either by the termination of Ms. Cox or by the Arbitrator's review thereof. Because the Arbitrator did not engage in any improper "second guessing" of DMS's decision to "follow[] the directives of the federal government [it] serve[s]," it follows that the Arbitrator's Decision necessarily did not violate any of the public policies promoted by those directives.

Further, adopting DMS's public policy argument would run contrary to controlling law, which strictly limits the Court's ability to refuse to enforce an arbitration award on public policy grounds. There is no "broad judicial power to set aside arbitration awards as against public policy." *Misco*, 484 U.S. at 43. Rather, "[f]or an arbitration award to violate public policy, the policy involved must be an explicit public policy that is well defined and dominant, and is ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest." *Air Methods*, 737 F.3d at 669 (citation omitted). As such "[t]he public policy rationale for refusing to enforce an arbitration award is a limited exception in which [the court] ask[s] only whether the award itself [], and not the underlying reasons for the award, violates public policy." *Id.* (citation omitted).

DMS argues that there is clear public policy favoring safety at military bases that is "well grounded and well defined in federal law." Doc. 15 at 18. But DMS does not support this argument,

as it must, with "laws and legal precedents." Instead, DMS mentions a broad proposition, unrelated to the specific issue of safety at military bases, that "employers can be cited by OSHA if there is a recognized hazard of workplace violence in their establishments, and employers do nothing to prevent or abate it," and cites to AFI 36-703, the Air Force workplace anti-violence policy that her termination documents indicate Ms. Cox violated in making the verbal threat to Mr. Potts. *Id.* AFI 36-703, "a general policy of [military base] safety[,] is not enough – there must be a showing of a specific public policy that would be violated by [the] award" issued by the Arbitrator herein. *Air Methods*, 737 F. 3d at 669. DMS has pointed to nothing in AFI 36-703 to suggest that every employee who violates it "must be fired," or that "once fired for such a violation," an employee cannot be awarded back pay. *Id.* Indeed, the CBA here required that Ms. Cox's termination – even if that termination was based in part on a violation of Air Force policies – be supported by just cause; the Arbitrator found that Ms. Cox's termination was not supported by just cause. DMS "cites to no precedent indicating there is a specific public policy against [awarding back pay] to someone in [these] circumstances." *Id.*

Controlling precedent directs that, "in the absence of a clearly defined public policy which would prohibit the arbitrator's award, [the court] will not disrupt the results of an arbitration award that draws its essence from a collective bargaining agreement." *Air Methods*, 737 F.3d at 670 (citation omitted). As discussed above, the Court finds that the Arbitrator's Decision drew its essence from the CBA. Accordingly, in the absence of a clearly defined public policy that would prohibit the Arbitrator's award, the Court is foreclosed from disrupting the results thereof. DMS has failed to establish the existence of such a clearly defined public policy. The Court thus declines to vacate the Arbitrator's award.

**CONCLUSION**

The Arbitrator contravened neither the CBA nor public policy in determining that DMS's termination of Ms. Cox was not supported by just cause and in awarding Ms. Cox back pay for the period from her termination until her commencement of new employment. Accordingly, the Court will not vacate the Arbitrator's award, as requested by DMS, but instead will enforce it, as requested by the Union.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment [Doc. 14] is **GRANTED** and Plaintiff's Motion for Summary Judgment and Brief in Support [Doc. 15] is **DENIED**.

**IT IS FURTHER ORDERED** that Data Monitoring Systems shall fully comply with the Arbitrator's Decision, the Arbitrator's Second Decision, and the award to Ms. Cox granted in those Decisions.

DATED this 7th day of June 2024.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE

22